Good morning, Your Honor. If it pleases the Court, my name is Mark Blun, attorney with the law firm of Aaron Fox, representing plaintiff appellant SR STEEL Ltd. The primary issue before the Court today is whether or not SR received a benefit based on its purchases of iron, ore, and fines, inputs into the steelmaking process through its purchases from a company called National Mine Development Corporation of India Ltd., NMDC. The Department of Commerce has had a long and interesting history of how it's approached this particular issue. In the review that immediately preceded the one before the Court today, the Department of Commerce, in determining the benchmark, looked at the price that SR paid and compared it to the price that NMDC charged to Japanese steel mills and put it on the same delivery basis and found a subsidy of 0.01%. In the preliminary determination of the case before the Court, the Department of Commerce changed the methodology just slightly and it took the average of the prices to the Japanese steel mills and averaged that with the price to a supplier that SR has never used in Hammersley, Australia, and compared those two on an FOB port basis. So they took the prices that were FOB Vizag, which is in India, which is where the Japanese steel mills purchased their goods, and the FOB price that is charged by the Australian suppliers at the port in Australia, averaged those two amounts, and compared that to the percent for freight from the mine, which is where SR purchases the goods, to the port in Vizag. You're not arguing, though, that you relied on that 2004 methodology? There is an issue that the approach to this has evolved, and the Department of Commerce has changed its position on this and it has altered its own opinion. So I do think there is a reliance issue. SR did go through the review. The facts were very similar, if not identical, between the two reviews. But we do believe, more importantly- But the reliance element that was pointed out in the opposition brief is something that they said you never argue that, and you reply you don't argue reliance. So what would the reliance be? It's not so much a reliance issue. We believe that what they did in 2004 was correct, and we believe that, statutorily, that was the correct interpretation. Okay, so you're not arguing that they're not permitted to change their methodology. You're saying that they just shouldn't have. That's correct, Your Honor. And it has evolved throughout the whole process, because that was in the previous one. The preliminary, in this case, they reached a different determination, but again, they looked at the cases and they took an average and compared it on FOB port basis. It wasn't until the final determination, in this case, Your Honor, that they eliminated completely the use of the Japanese steel mills. They used only- this is for fines only- lumps or ore they treated slightly differently. They looked to Brazil for the prices for ore, and then they added delivery charges to it. In the previous two determinations, they had a FOB port basis, which in this industry is how the prices are determined. The regulations say they have to be delivered prices, right? Absolutely. The regulations do say that. The statute, however, says that the Department of Commerce should determine adequate remuneration based on the prevailing market conditions. And at least transportation is one of those prevailing market conditions, and we don't believe that it should be ignored completely. But the way you take it into consideration is by comparing the prices the way the market looks at these, which is- Let me ask you a question about this. You cite that Viraj Group limited case for the- I'm sorry. You cite the Viraj Group limited case for the proposition that we should ignore the delivered price regulations because it would produce an absurd result, and yet you knew at the time that that case had been overruled. Yes, that may not have been the best case, but- But you actually knew because the Court of International Trade had told you that case was overruled. I apologize, Your Honor. That probably should not have been included in the brief. But at the same time, you do have a situation where this does lead to absurd results. It leads to the result where what Department of Commerce and the U.S. Steel Industries are arguing is that in order for the NMDC not to have- sell at subsidized prices, they have to charge world market prices plus delivery from Australia or Brazil. So that leads to a very interesting result in that if you have a world market price, for example, of $100 and it costs $90 to deliver it from Brazil or Australia to India, NMDC has to charge $190 to SR and other domestic producers, while it charges $100 to foreign producers. Interestingly enough, that is dumping. So NMDC has put in the box of saying, well, you either have to subsidize or you have to sell at unfair prices, dumped prices. We do believe that that's not what the drafters of the statute intended, Your Honor. And it does lead to very absurd results. The market does require FOB pricing, right? Is the regulation inconsistent? Should the regulation be struck down? You haven't really challenged it, is my question. In this particular situation, Your Honor, the regulation should- the regulation is contrary to what the statute says. The statute says you look at the prevailing market conditions. It makes some sense. I'm just wondering why you didn't challenge the regulation. We believe that the- we did in the sense that we believe that it's inconsistent with the statute. So it's whether or not we explicitly said the regulation should be overturned. But we do believe that the statute's very clear, that you look at the markets- prevailing markets- You challenged methodology, but you didn't really challenge the regulation. Are you accepting the validity of the regulation? We're accepting- now, we accept that the regulation says what it says, which you will consider transportation. We have- we were very explicit that we believe that it's inconsistent with the- the implementation in this case was inconsistent with the statute as it's written. So, Your Honor, beyond that, with the- well, we've been discussing the addition of the freight charges. We do believe that the selection of the Japanese steel mill prices was correct because this is a price that is based in India. It is from the same mine. It is same- very similar contractual terms as SRs. The only difference between what the terms of the Japanese steel mills receive and what the SR receives is SR takes delivery of the- of the goods at the mine. So part of the contract with SR is it delivers the goods- it takes delivery at the mine, and in the case of fines, it was responsible for putting in a conveyor belt, what's referred to as a beneficiation facility, and a slurry pipeline, where it to the fines. The lumps are transported by freight to the port. So the only difference between the Japanese steel mills and the SR ones are the SR handles transportation from the mine down to the port. But aren't the regulations very clear that- that you don't consider governmental sales in the absence of some kind of public auction or public bidding? No. Competitive bidding? No. They say that they will consider it in certain circumstances such as a competitive auction. They are by no means limited to that. So what are your exceptional circumstances here? You have a situation where you're selling a commodity product. The price to SR is in its contract specified. It's changed by the terms the price. It becomes part of the world market prices. It's published as a world market price, and it goes into determining the world market prices. So I do believe that in this situation, you have a negotiated situation with a non-domestic producer. Let me- let me go back to that. You said that- as I read this regulation, it says if the- to determine the market price, such a price could include prices stemming from actual transactions between private parties, actual imports, or in certain circumstances, actual sales from competitively run government auctions. That means you at least need a government auction, and sometimes we won't even consider those. But you're saying that you read that to say a- a government auction is one option, but you can consider other government pricing? I believe there is- if it said only in the situation of a competitive run government auction, then that would be correct, but it doesn't say that. The language is left more vague- deliberately left more vague than that. So there may be other situations. All right, so you read that to say that- that we can look at or Congress should look at governmental sales in the absence of any kind of competitive bidding or- or public auction. It is a negotiated price between foreign produced- foreign manufacturers and the company. And it's been accepted by the Department of Commerce previously. So it's not that- I'm that radical in this suggestion. Did you present any evidence that it was an arm's length negotiation? Yes, there is information on the record that discusses the- the negotiation process, and that discusses that the- the price increase that occurred during this particular period between the two parties. Furthermore, there is a clause in the contract with SR that says if perchance the- because SR's prices are set annually, but there is a clause that says if they deviate by a certain amount from world market prices, there can be an adjustment made. So there is- there- there was a negotiated settlement or negotiated price between the Japanese steel mills and NMDC. All the parties agree on that. And there is evidence on the record to that effect. There's evidence on the record about the price increase. The prices are then published internationally. If I can move on. Yes, go ahead. Okay. Beyond that, if- after the- the final determination, the court did- the CIT did remand it for further adjustments. In the course of that, certain adjustments were made that did not have any legal or factual basis. Most importantly, in the case of fines, the Department of Commerce added freight charges from BICIC, which is on the southeastern portion of- of India, and for shipment up to Hazira, which is where the steel plant is, which is on the northwest of- of India. However- How do you respond to the argument that if- if- if that was backed out, that it would be backed out of the benchmark and there would be a wash? Your Honor, our- our calculations is it's not. That in the course of making this adjustment, they did increase the margin. It's not a wash. Just based on the way we- we redid their calculations. I wouldn't be arguing- I didn't understand the question. It's based on the way you- we did- When we looked at it, we don't believe it's a wash. Mathematically, it increased the margin. By how much? I- I'm sorry, Your Honor. I don't know that. But there was no legal basis whatsoever. The fines are never delivered to Hazira. They're used in BICIC. They're turned into pellets. The pellets, which is an intermediate product, is shipped to Hazira. Beyond that, they also, in the course of lumps, they added certain expenses that were already in the freight charges to Hazira. So, they double counted certain expenses. We did discuss that in the remand determination. Your Honor, we do believe the evidence on the- there is evidence on the record of this. And we believe that the case should be, at the very least, remanded back to redo those calculations. Thank you, Mr. Lund. Mr. D. Alessandris. Thank you, Your Honor. May it please the court. As Mr. Lund noted, the main issue here in this appeal is whether SR Steel received the subsidy from the government of India through its purchases of iron ore lumps and fines from a government-owned entity. In looking to determine whether or not a company has paid adequate remuneration for government provided good, the Commerce Department set up a regulation, which we've discussed already, Section 351, 511. And Commerce reasonably created a three-tier system. First, they looked for actual private market transactions in the country it issued. There were no private market transactions. We've read that, Mr. D. Alessandris. Talk to me a minute about what appear to be some imaginary delivery charges. The comparable foreign fine product would be delivered to Visek, and the further shipment would be the same, right? So why do you charge them the further shipment cost? The Commerce Department wanted to make an apples-to-apples comparison, and so they looked at both charges delivered to the steel mill in Hezira, because the fines would be delivered if they were purchasing from Hammersley using this second-tier price of a world market price. They priced it for delivery to the steel mill in Hezira. In both calculations, the Commerce Department assumed that the goods were landed in Visek and then were shipped from Visek to Hezira, and they charged the same freight charge per metric ton from Visek to Hezira in both calculations. So they're being charged the same freight charge in both for delivery to the mill. But it's not real world. That's not what they would do with it. Well, it goes to the pelletization plant, and the pelletization plant converts the fines from fines to fines in pellets, and then they're shipped to the steel mill in Hezira, and the calculation was the same and charged the same freight charges in both. The fines only arrive in Visek, though. Yes, Your Honor. Why do we go beyond that? We understand we're dealing with steel here, so that you're a heavy product. The delivery charges are more expensive than almost anything else that happens here. You have to be careful on this. Yes, Your Honor, but the same freight charge, the same charge per metric ton was added on both sides of the equation, both to the hypothetical purchase from Hammersley and from the actual shipment of the pellets. They said it's not the same. Well, Your Honor, that's not in the record. The Commerce Department looked at it and determined that it was appropriately adding both. This was discussed in the remand comments in the... When the market does all shipments FOB, how can the regulation charge delivery rates? Well, Your Honor, the statute requires that... The statute requires market. Market including... And the regulation does something contrary to the market. I don't believe so, Your Honor. What should take precedence, the statute or the market? Well, obviously the statute has to take precedence. So what happens to the regulation when it's requiring something the market doesn't require? Your Honor, it's consistent with the statute. There's a gap there. The Commerce Department reasonably filled the gap to require transportation. And, Your Honor, even though the quote may be... Why is it reasonable if the market does everything FOB for you to charge delivery rates? That's the quoted price, Your Honor. However, SR purchased lumps from a provider in Brazil and had to pay the freight charges to transport those lumps from Brazil to its steel mill in Hezira. And the Commerce Department reasonably included those transportation charges. SR says it's not reasonable, but in fact, they did purchase lumps from a Brazilian producer and paid to transport those lumps to their steel mill in Hezira. And so in determining whether or not they paid adequate remuneration to the government of India, they had to look at the world market price as a second tier price in calculating the price from Hammersley. Is it your position that governmental sales can never be arm's length or reflect market prices? It's not the position, Your Honor. It's just that the Commerce Department reasonably was suspicious of government prices, so they private transactions in the country at issue. For the lumps, that was Brazil. So if you've got a governmental sole source and they sell not only to in-country but to people outside the country... I'm sorry, Your Honor. I'm not finished with my question. So are you saying that unless they sell in a public auction, then you could never consider those to be market prices? Not at all, Your Honor. Those would be third tier prices. The third tier, if there are no market prices reasonably believed to be available to the purchasers in that country, the Commerce Department looks at government prices that are consistent with market principles. And everything that SR is arguing that these were set based on negotiations with select Japanese producers in an arm's length transaction, that establishes that it may be a price consistent with market principles, but it's still a government price. And under Commerce's regulation, that's a third tier price, and you only look at the third tier price when there's not a first tier price or a second tier price. For the lumps, there was a first tier price. They actually purchased lumps from Brazil, and they were import transactions into the country, private transactions. For the fines, they found a second tier price with the text report and the fines from Hammersley, Australia. And so they didn't need to look at a third tier price. Had there not been a second tier price for the fines, they may have reasonably looked at these and determined that they were... So were there other prices in 2004 when you were willing to look at these Japanese prices? In 2004, SR did not purchase fines, according to their questionnaire response. They only purchased lumps. And the Commerce Department used the NMDC prices along with the private market prices, I believe, to create a weighted average for the purchase of lumps. In this review, Commerce didn't change its methodology because for the purchase of lumps, there was a different data on the record. In other words, the private purchases from Brazil. And so the Commerce Department didn't change its methodology with lumps, and they never made a as they did in 2004. Well, and as they did in the preliminary, because, Your Honor, they realized that these were government prices, and they determined that the world market prices should be private prices, and they reasonably excluded the government prices. And it would make no sense to compare, to determine whether they're paying adequate remuneration to look at a government price and compare a government price to another government price. How are companies supposed to know what to do when Commerce keeps changing how it interprets its own regulations? Well, Your Honor, here the regulations are clear that the private transactions are preferred. And there was no reliance on a previous review because they never made a determination with the fines in the previous administrative review, and they didn't have the private market sales from Brazil in the previous administrative review, so there were no changes. They changed from the prelim. However, in the prelim, the private market prices from Brazil, as I understand it, were added after the preliminary results, and so they were not available when they did the preliminary review. Results of review. Additionally, Your Honor, I would like to touch just on the failure to exhaust argument, and SR alleges that they raised the issue below, and what they cite to is a What the questionnaire response says is that in the case of DRCLO, which is another term for the lumps, having lower FE content, iron content, the same cannot be used for the manufacture of HBI-DRI, such low-grade ore used in blast furnace technology. The argument that they're alleging, that the Court of International Trade found that they had not raised below pertained to the fines. Their questionnaire response, their citing simply says the lumps might not be compatible. However, for the lumps, as we mentioned, the Commerce Department looked at the private market transactions from Brazil. The Commerce Department only used the Hammersley price for the fines, and it states nothing in that questionnaire response about the fines being incompatible, and I see I'm out of time. Thank you, Mr. De Los Angeles. Mr. Boland. Thank you, Your Honor. May it please the Court, I'm Nathaniel Boland on behalf of Skadden Arts, representing defendant Appelli, United States Steel Corporation. I'd like to begin with the point that was made in SR's brief concerning the arm's length test in the anti-dumping duty context is designed to get at something very specific, and that is whether a respondent's sales in its home market are at arm's length to affiliates and therefore can be treated as consistent with the normal value or the normal sales in that market. By contrast, under the countervailing duty statute, Commerce is tasked with addressing whether there has been a benefit to the recipient. So it's not looking at whether the prices by NMDC to SR and to the Japanese purchasers are normal in the context of NMDC's normal sales. It's looking at whether SR has received a benefit as a result of the financial contribution, the provision of the good, in this case iron ore lumps and fines. Now, the only way to measure that benefit to the recipient is, I would submit to you, in comparison to what is charged in the market, and Commerce has done that here. First of all, with respect to the iron ore lumps, Commerce used SR's own purchase of iron ore from Brazil, which SR paid the delivery charges to its factory in Hazira. There's been no argument that that is not a market-based transaction. It shows that there is a demand in NMDC prices. Commerce, in the final results, was looking at whether these NMDC prices were set in accordance with market principles, and it found that they were not, based on the fact that NMDC, as a government entity, had other bases for supplying this iron ore. We have on the record the fact that India maintains export restraints on high-grade iron ore, which is the particular type of iron ore that's an issue here. We have on the record the fact that NMDC only deals and only makes these iron ore products available to certain overseas purchasers and consumers of iron ore within India. So it's not as if something is provided to all purchases throughout India, trading companies, steel companies, what have you. It's very specifically limited to the Indian steel companies and certain select overseas purchasers. So you're saying that Commerce made a determination that they were attempting to confer a benefit on the Japanese purchasers? No, I think it didn't reach that far, Your Honor, but it did look at whether, under its regulations, which is, it's implemented this particular three-tier system to discover whether prices are set in accordance with market principles, it found that those did not meet either the first or the second tier. And by contrast, it had available other information on the record that, in the case of the lumps, were actual imports into India, and in the case of the fines, were world market prices that it was reasonable to believe would be available to a purchaser in India. Why didn't the sales to Japan meet one of the first two tiers? Well, first of all, there's no evidence on the record, Your Honor, that those sales were available to anyone in India and the statute requires that Commerce look at the prevailing market conditions within the country under investigation or review. And as I think I was mentioning, there are also these export restraints and other sales, and it was very clear from the record that these NMDC prices to the Japanese purchasers were only available to five select Japanese steel companies. I'd like to also just touch briefly on the question about whether the Visig to Hazira freight charges, the inclusion of those, were somehow distortive. And, you know, here I would point you to the record at JA356 through 358 and JA383 through 385. This is from the remand proceedings. I don't think there's a scintilla of evidence on the record, Your Honor, that the inclusion of these charges had any difference to the outcome here. And I think Commerce was reasonably trying to value prices on a deliberate basis to the same point. But the fact is, whether those charges from on the issue of the different fees that were added, these were fees that were all taken from SR's own purchase of iron ore lumps. These were fees that clearly on the record showed that an importer in India would have to pay these various fees, including the landing fees, as part of an import into India. And here I point you to JA1585. There's no evidence that the landing fees of which SR is complaining are at all duplicative of any of the other fees that are listed in that evidence. And I think in accordance with the statute and its regulations, it was proper for Commerce to include those here. Thank you. Thank you, Mr. Boland. Mr. Lunn, you have about a minute and a half. Oh, thank you, Your Honor. I just want to touch on a couple of matters that were raised by the Department of the Steel Industry. First, when we were talking about the Brazilian purchases, I think it's important to note that what SR was purchasing from Brazil were lumps delivered at the port in Brazil. That was the term of their contract. Yes, they then took over the responsibility for shipping. But what they're claiming is that NMDC has to charge the same as that freight. However, that gets to the question, are they providing lumps in ore at the port from the mine to where it has to get it to produce it? So I think they're mixing up an issue of subsidization of an input into the steelmaking process, that's lumps or fines or iron ore generally, and the issue of whether basically they're doing freight dumping or freight subsidization. That's not an issue here. If you look at the Brazilian sales and the contract for those sales that are on the record, compare those prices with the price SR paid to NMDC, they are very similar, if not identical. That shows that SR is paying world market prices for its iron ore and fines, irrespective of where the goods are coming from. Another point that was made, there's no evidence that Japanese steel mill prices are available to companies in India. This is patently false, your honor. SR's own prices are based on the prices to the Japanese steel mills. That's in the contract. Once a year, SR's prices get adjusted to conform with the prices that the Japanese pay, so that they are not receiving a benefit or any kind of unfair competitive advantage based on their foreign competitors. These then go in and they're published in the text report, which the United States Department of Commerce has said is a source of world market prices. However, they like to be selective about what they consider to be a world market price. Final thought? Thank you, your honor. I do hope that you will consider remanding this case back to the Court of International Trade to adjust the benchmark in this case. Thank you. Thank you very much.